﻿Citation Nr: AXXXXXXXX
Decision Date: 01/29/19 Archive Date: 01/29/19

DOCKET NO. 181101-790
DATE: January 29, 2019

ORDER

Entitlement to an initial 30 percent rating for benign paroxysmal positional vertigo from October 1, 2013 to May 11, 2018 is granted.

Entitlement to an initial rating in excess of 50 percent for PTSD from October 1, 2013 to March 20, 2016 is denied.

Entitlement to a 70 percent for PTSD from March 21, 2016 to May 11, 2018 is granted. 

Entitlement to an initial compensable rating for headaches from October 1, 2013 to May 11, 2018 is denied.

REMANDED

Entitlement to an initial rating in excess of 10 percent for hypothyroidism from October 1, 2013 to May 11, 2018 is remanded.

Entitlement to service connection for a left knee disability is remanded.

Entitlement to service connection for a right knee disability is remanded.

Entitlement to service connection for a sleep disorder is remanded.

FINDINGS OF FACT

1. The Veteran’s benign paroxysmal positional vertigo has resulted in dizziness and occasional staggering.

2. From October 1, 2013 to March 20, 2016, the Veteran’s PTSD symptoms are consistent with occupational and social impairment with reduced reliability and productivity.

3. Resolving all reasonable doubt in favor of the Veteran, from March 21, 2016, her PTSD symptoms more nearly approximated occupational and social impairment with deficiencies in most areas, but symptoms of total occupational and social impairment have not been demonstrated..

4. The severity of the Veteran’s headaches is characterized by less frequent attacks.

CONCLUSIONS OF LAW

1. The criteria for an initial 30 percent rating, for benign paroxysmal positional vertigo have been met. 38 U.S.C. §§ 1155, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.10, 4.87a, Diagnostic Code (DC) 6299-6204.

2. From October 1, 2013 to March 20, 2016, the criteria for an initial rating in excess of 50 percent for PTSD have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.130, DC 9411.

3. From March 21, 2016 to May 11, 2018, the criteria for a 70 percent rating for PTSD, but no higher, have been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.130, DC 9411.

4. The criteria for an initial compensable rating for headaches have not been met. 38 U.S.C. § 5107; 38 C.F.R. §§ 4.1, 4.6, 4.7, 4.124a, DC 8199-8100.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from August 1992 to September 2013 with service in during the Gulf War Era in Saudi Arabia.

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Board is honoring the Veteran’s choice to participate in VA’s test program, RAMP, the Rapid Appeals Modernization Program. 

This case comes before the Board of Veterans’ Appeals (Board) on appeal from a September 2018 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO). 

The Board notes that the Veteran filed a claim for service connection for primary hypersomnia. However, in light of the U. S. Court of Appeals for Veterans Claims (Court) holding in Clemmons v. Shinseki, 23 Vet. App. 1 (2009), the Veteran’s claim was recharacterized as listed above, entitlement to service connection for a sleep disorder. 

1. Entitlement to a higher initial rating for benign paroxysmal positional vertigo from October 1, 2013 to May 11, 2018

The Veteran asserts that she is entitled to a higher rating for her benign paroxysmal positional vertigo. The Veteran expressed that she has episodes of vertigo on a regular basis. The Veteran stated that she must hold on to things when she bends down and that she randomly loses her balance when picking something up or when looking up. See July 2015 Statement in Support of Claim.

DC 6204 provides ratings for peripheral vestibular disorders. Peripheral vestibular disorders manifesting occasional dizziness are rated 10 percent disabling. Peripheral vestibular disorders manifesting dizziness and occasional staggering are rated 30 percent disabling. A Note to DC 6204 provides that objective findings supporting the diagnosis of vestibular disequilibrium are required before a compensable rating can be assigned under DC 6204. Hearing impairment or suppuration shall be separately rated and combined. 38 C.F.R. § 4.87.

Dizziness is defined as “a disturbed sense of relationship to space; a sensation of unsteadiness with a feeling of movement within the head.” See Dorland’s at 559. The term “staggering” is not defined in the rating schedule, but is generally defined as standing or proceeding unsteadily. See Webster’s New College Dictionary 1099 (3rd ed. 2008).

The Veteran was afforded a VA examination in September 2014. The Veteran reported that her disability began in 2003. The Veteran indicated that she would feel her room spinning when laying down, nausea when standing up, feelings of being off balance, and blurry eyes. 

The Veteran expressed that in the year of 2010 and 2011, her vertigo worsened and it hindered her at work. The Veteran reported that whenever she would bend over, she would fall. The Veteran reported that she currently experiences vertigo every other month. Upon physical examination, the examiner reported normal gait, normal Romberg test, and normal Dix Hallpike test. 

Private treatment records from Advanced Practice Physical Therapy dated January 17, 2013 revealed that the Veteran reported two “drunk” spells from moving too quickly. 

Private treatment records from Advanced Practice Physical Therapy dated January 24, 2013 revealed that the Veteran noticed a sense of unbalance in certain situations but the Veteran was pleased that her vertigo has not returned. 

Private treatment records from Advanced Practice Physical Therapy dated in March 2013 revealed that the Veteran had episodes of vertigo intermittently but noted that the Veteran knows how to manage it independently. The Veteran described her vertigo as dizziness, nausea, swooshing, and “drunk.” The examiner indicated that the Veteran’s vertigo limits functional activities. 

In a February 2014 VA treatment note, the Veteran was afforded a traumatic brain injury screening in which the Veteran reported balance problems or dizziness. 

In a July 2015 Statement in Support of Claim, the Veteran expressed that after going to physical therapy for her vertigo, she was afforded a good routine to help minimize her vertigo occurrences. The Veteran expressed, however, that she still has vertigo episodes on a regular basis. The Veteran expressed that she still has to hold onto things when she bends down and that she will randomly lose balance when picking something up or when looking up. The Veteran expressed that she has fallen into doors trying to bend down. The Veteran reported that she cannot tilt her head back without holding onto something or she will fall or stumble. 

VA treatment note dated in March 2014 revealed that the Veteran reported experiencing mild loss of balance, which was defined as being occasionally present but it does not disrupt activities. In addition, the Veteran expressed that her vertigo feels like everything is spinning, “like on a tilt a whirl.” The Veteran expressed that when her vertigo is severe it can be associated with nausea and vomiting. 

The Veteran was afforded another VA examination in April 2016. The Veteran reported having vertigo daily with multiple episodes a day brought on by leaning forwards or backwards. She expressed that she may fall to the ground. 

The examiner noted that the Veteran does not have Meniere’s syndrome. Upon physical examination, the examiner reported normal gait, normal Romberg test, and normal Dix Hallpike test.

After a review of the relevant evidence of record, and after resolving any reasonable doubt in favor of the Veteran, an initial 30 percent rating is warranted. 

Lay testimony is competent to establish the presence of observable symptomatology, such as the frequency and effects of the Veteran’s vertigo. Layno v. Brown, 6 Vet. App. 465, 469 (1994). For example, when a condition may be diagnosed by its unique and readily identifiable features, the presence of the disability is not a determination “medical in nature” and is capable of lay observation. In such cases, the Board is within its province to weigh that testimony and to make a credibility determination. See Barr v. Nicholson, 21 Vet. App. 303 (2007).

As noted above, in order to support a 30 percent rating, the preponderance of the evidence must show dizziness and occasional staggering. In this case, the medical and lay evidence of record consistently documents the Veteran’s complaints of vertigo and dizziness, a criterion of both the 10 percent and 30 percent ratings under DC 6204. Additionally, although the September 2014 and April 2016 VA examiners failed to document evidence of staggering, private treatment records document complaints of loss of balance. Such reports are corroborated by the Veteran’s consistent and probative lay statements, where she reported symptoms including balance issues, dizziness, and occasional falls. In multiple statements, the Veteran reported that she must hold onto things when she bends down. 

Therefore, after resolving any reasonable doubt in favor of the Veteran, the preponderance of the probative medical and lay evidence of record supports the assignment of a maximum schedular 30 percent initial rating for benign paroxysmal positional vertigo.

2. Entitlement to an increased rating for PTSD from October 1, 2013 to May 11, 2018

The Veteran contends that she is entitled to a higher rating for her service-connected PTSD. The Veteran’s PTSD was rated at 50 percent from October 1, 2013. She then received a 100 percent rating due to a hospitalization over 21 days, from September 21, 2016 to January 31, 2017, and 50 percent thereafter. The period during which the total rating was in effect is excluded from consideration in adjudicating the higher rating claim on appeal.

The Veteran’s PTSD has been evaluated under the General Rating Formula for Mental Disorders. 38 C.F.R. § 4.130, DC 9411. Under that formula, a 50 percent evaluation is warranted for PTSD where there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 

 A 70 percent evaluation is warranted where there is objective evidence demonstrating occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, or effectively; impaired impulse control, such as unprovoked irritability with periods of violence; spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances, including work or a work-like setting; and the inability to establish and maintain effective relationships.

A 100 percent disability evaluation is warranted when there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time and place; and memory loss for names of close relatives, own occupation, or own name. 

When rating a mental disorder, VA must consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the claimant's capacity for adjustment during periods of remission. VA shall assign a rating based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126 (a). When rating the level of disability from a mental disorder, VA will consider the extent of social impairment, but shall not assign a rating solely on the basis of social impairment. 38 C.F.R. § 4.126 (b).

Ratings are assigned according to the manifestation of particular symptoms, but the use of a term "such as" in 38 C.F.R. § 4.130 demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002).

When determining the appropriate disability evaluation to assign, the Board's primary consideration is a veteran's symptoms, but it must also make findings as to how those symptoms impact a veteran's occupational and social impairment. Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013); Mauerhan v. Principi, 16 Vet. App. 436 (2002). Because the use of the term "such as" in the rating criteria demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, the Board need not find the presence of all, most, or even some, of the enumerated symptoms to award a specific rating. Mauerhan, 16 Vet. App. at 442; see also Sellers v. Principi, 372 F.3d 1318, 1326-27 (Fed. Cir. 2004). Nevertheless, all ratings in the general rating formula are also associated with objectively observable symptomatology and the plain language of the regulation makes it clear that the veteran's impairment must be "due to" those symptoms. A veteran may only qualify for a given disability by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio, 713 F.3d at 117. 

Following her PTSD claim, the Veteran was afforded a VA examination in September 2014. The examiner noted that the Veteran had occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by medication. 

The examiner reported that the Veteran is not currently married and has one son. The Veteran maintains regular contact with her son. The Veteran has a few friends. The Veteran maintains contact with her mother and talks with her brother daily. For recreation, the Veteran enjoys riding her motorcycle, fishing, hiking, swimming, and surfing. The Veteran denied work impairment due to mental health problems. 

The Veteran denied thoughts or any history of suicidal ideation. The Veteran was appropriately dressed and groomed. No remarkable affect, cognitions, or behaviors were observed. The Veteran was socially appropriate. The Veteran was oriented to time, date, and place. Cognitions were linear and logical. The Veteran denied delusions, hallucinations and their persistence. The Veteran had some organizational needs with mild irritation. The Veteran has sleep impairment. The Veteran was able to recall one out of four objects following a short interval. The Veteran experiences panic attacks when triggered by multiple environmental cues. 

In an April 2015 VA mental health initial evaluation note, the Veteran reported obsessions, compulsions, being socially avoidant, being easily startled, always on alert, intrusive thoughts, and panic attacks. The Veteran reported excessive anxiety and worry, social isolation, fatigue, depressed mood, and feelings of worthlessness. The Veteran denied current suicidal ideation. The examiner noted that the Veteran was well groomed and her behavior was appropriate. Judgment and insight were average.

In a May 2015 VA mental health note, the Veteran reported experiencing fleeting suicidal ideation but has never attempted suicide. 

In a July 2015 VA mental health note, the Veteran continued to report complaints of fatigue, sleep disturbance, weight gain despite working out. The examiner indicated that several of the Veteran’s symptoms were consistent with hypothyroidism. The examiner reported that the Veteran was casually dressed and groomed. She was alert and oriented to person, place, and time. There was no suicidal or homicidal ideation. 

In an August 2015 VA mental health note, the Veteran reported being frustrated and angry the previous week. The Veteran also indicated an ongoing struggle adjusting to civilian life. The examiner noted that the Veteran was casually dressed and groomed with a linear and organized stream of thought. No suicidal or homicidal ideation was noted. No deluded notions were noted. 

In a September 2015 VA mental health note, the Veteran reported having some irritability. The Veteran’s sleep patterns remain disrupted with PTSD related arousal and intrusive thoughts. The examiner noted that the Veteran was appropriately dressed, with no suicidal or homicidal ideation noted. 

The Veteran was afforded a VA mental examination in October 2015. The examiner noted that symptoms that are attributed to the Veteran’s PTSD include intrusive memories of trauma, vigilance, discomfort in some situations, avoidance, socia withdrawal, and avoidance of memories. 

The examiner also diagnosed the Veteran with Circadian Rhythm Sleep-Wake Disorder Shift Work Type that include symptoms of recurring pattern of sleep disruption due to an alteration in her sleep schedule associated with work shifts, daytime drowsiness, and difficulty initiating sleep.

The examiner reported that the Veteran has occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation.

The examiner noted that the Veteran maintains regular contact with her son but is limited due to him having a girlfriend. The Veteran currently lives with her brother. The Veteran expressed that they argue at times, but denied any police or outside involvement. She reported some significant personality differences that contribute to their challenges. The Veteran has a few friends she maintains contact with in the military and a few local friends on Kauai. The Veteran engages in social and leisure activities.

The Veteran is currently employed working as a control room operator at a biomass power plant working on a rotational shift. The Veteran’s schedule includes having four night shifts, two days off, four day shifts, one day off, three night shifts, three days off, four nights and then a week off. The Veteran reported working with only one other person most of the time and that work is going well with some challenges with infrastructure. She took the job in May 2014. The Veteran denied work impairment due to mental health problems. 

The Veteran reported going to bed around 11 or 12 PM and taking 30 to 60 minutes to fall asleep due to racing thoughts. The Veteran reports waking two to four times each night due to dreams. 

The Veteran noted experiencing loss of strength in her arms at random times and has difficulty moving her arms and denied that this was connected to muscle fatigue. 

The examiner noted that the Veteran denied thoughts or any history of suicidal ideation. The Veteran arrived on time and was appropriately dressed and groomed. The examiner noted that the Veteran had no remarkable affect, cognitions or behaviors observed. She appeared tired and run down with occasional yawns. The Veteran worked the night shift the previous night. The Veteran was oriented to time, date, and place. She was pleasant and cooperative throughout the interview and answered questions without difficulty. Cognitions were linear and logical.

The Veteran reported some delusion and/or hallucinations. The Veteran reported seeing movement in the corner of her eye and recently seeing a face in the window. The Veteran stated that she hears people at work when there is no one around. The Veteran was able to recall three out of four objects following a short interval.

In a January 2016 VA mental health note, the Veteran reported being tired as she has been working 12-hour days with only three days off in December. Examination of the loss of a fellow coworker was conducted. The Veteran indicated that it brought about memories and intrusive thoughts. The Veteran was appropriately dressed, with no suicidal and homicidal ideation. 

In a February 2016 VA mental health note, the Veteran arrived early on time. The Veteran reported sleeping longer but still experiences nightmares and nocturnal awakenings. The examiner discussed the difference between depression and fatigue secondary to shift work, which led to a discussion of positive and negative aspects of the Veteran’s work. The examiner noted that the PCL was administered and the Veteran continues to endorse clinical items indicating the presence of PTSD symptomatology. The Veteran’s overall score was lower in comparison to her previous scores. The Veteran has not been able to attend her PTSD group for three months due to her shift work schedule. 

The Veteran’s appearance was appropriate. The Veteran was alert and oriented to person place and time. No suicidal and homicidal ideation was noted. 

In light of the above, the Board finds that from October 1, 2013 to March 20, 2016, the Veteran’s service-connected PTSD is consistent with the criteria for a 50 percent, but not higher rating. 

The Board emphasizes that the symptoms associated with the Veteran's PTSD do not meet the criteria for the 70 percent from October 1, 2013 to March 20, 2016. In sum, taken as a whole, the available record does not support an increase to 70 percent for this staged rating period, as there is no indication the Veteran suffered from suicidal ideation; obsessional rituals that interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting ability to function independently, appropriately, and effectively; impaired impulse control (e.g., unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (e.g., work or work-like setting); inability to establish/maintain effective relationships. 

The Board finds that the persuasive evidence during this period fails to indicate occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, and mood, as is required for the next higher rating of 70 percent. Bowling v. Principi, 15 Vet. App. 1 (2001); Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013) (holding that a 70 percent disability rating requires sufficient symptoms of the kind listed in the 70 percent requirements, or others of similar severity, frequency or duration, that cause occupational and social impairment with deficiencies in most areas such as those enumerated in the regulation). The Board finds that the Veteran's symptoms of PTSD more nearly approximated the criteria for a 50 percent rating, and that an increased rating for this period from October 1, 2013 to March 20, 2016 must be denied. 

However, resolving all reasonable doubt in favor of the Veteran, the Board finds that her service-connected PTSD more nearly approximates the criteria for a higher 70 percent rating, but not higher, from March 21, 2016. 38 C.F.R. § 4.7 . 

In granting a 70 percent rating for the Veteran's PTSD, the Board has considered the rating criteria in the General Rating Formula for Mental Disorders not as an exhaustive list of symptoms, but as examples of the type and degree of the symptoms, or effects, that would justify a particular rating. The Board has not required the presence of a specified quantity of symptoms in the rating schedule to warrant the assigned rating for PTSD. Mauerhan, 16 Vet. App. 436 (2002).

The Veteran was afforded a VA examination on March 21, 2016. The examiner reported that the Veteran has occupational and social impairment with reduced reliability and productivity.

The Veteran reported living with a roommate and reports that they keep to themselves. The Veteran reported that her son had visited with his girlfriend and that she created conflict between the Veteran and her son and they have not talked since that time. The Veteran’s brother lives close by and they generally get along well though do not spend much time together. The Veteran spends her free time working on the house or walking her dog. She denied having any close friends. The Veteran indicated that she tends to avoid social and leisure activities.

The Veteran reported that she has been working for two years at her most recent job. The Veteran stated that she works 40 hours a week in 12-hour shifts. She indicated that she is in the control room working with computers and monitoring systems and that there are alarms going off frequently. She noted that the alarms going off makes her feel anxious and it affects her sleep. 

The Veteran reported that she has experiences with irritability and anxiety due to the long shifts and alarms going off. She noted occasionally raising her voice at work. The Veteran denied suicidal ideation. 

The examiner noted that the Veteran has persistent negative emotional state, markedly diminished interest or participation in significant activities, and feelings of detachment or estrangement from others. In addition, the Veteran has irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects, hypervigilance, exaggerated startle response, problems with concentration, and sleep disturbance. 

In a May 2016 VA PTSD residual rehab program consult note, the Veteran reported experiencing a rough time transitioning to civilian life since retirement from the Air Force in July 2013. The Veteran reported that if she lets her guard down, she tends to see things that are not there. For example, the Veteran described how a water bottle looked like a grenade on a windy day. The Veteran denied anxiety in crowded areas like the grocery store but reported that she shops quickly. 

When the Veteran was asked about mood and depression, she reported that she has her depression attacks that can get rough. The Veteran indicated that she thought about suicide a couple of times. She reported that her most recent suicidal ideation was a couple months ago but it was just thoughts. The time before that, about eight months ago, the Veteran had her car parked six inches from a cliff and was thinking about driving over it. The Veteran noted that three years ago she held a loaded gun in her mouth. The Veteran denied any thoughts, plan, or intent today and stated that she would never do it because of her youngest son.

When asked about her anxiety, the Veteran stated that when things start stressing her out, she starts blacking out. The Veteran indicated that she loses time and she only realizes she has lost time when her phone goes off and she remembers she was supposed to be somewhere. 

The examiner noted that the Veteran reported two instances where the Veteran’s behavior concerned her or was potentially harmful, which included driving recklessly and almost becoming physically aggressive during an argument with a neighbor. The examiner reported that the Veteran’s dissociative symptoms are likely a result of avoidance, coping, and extreme lack of emotional awareness. 

The examiner expressed that despite very limited emotional awareness, the Veteran appeared to be straightforward in reporting symptoms and appeared to be motivated for treatment. During the screening, the examiner noted that the Veteran demonstrated no impairment in consciousness, psychosis, or any significant risk of imminent harm to herself or others.

In a January 2017 VA suicide risk assessment note, the Veteran reported previously removing firearms from house.

In a January 2017 VA mental health note, the Veteran’s mental status was noted to be alert and oriented. The Veteran denied suicidal and homicidal ideation. The examiner noted that the Veteran completed the PTSD program and will fly back home to Hawaii. The examiner reported that the Veteran seemed attentive and cooperative and appeared to have a normal energy level. The Veteran’s speech was linear and goal-directed. The Veteran demonstrated awareness of herself and her PTSD symptoms. 

Although the medical evidence does not show symptomatology such as obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively, and spatial disorientation, the symptoms noted in the rating schedule are not intended to constitute an exhaustive list, but rather are designed to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular disability rating. Thus, even though not all the listed symptoms compatible with a 70 percent rating are shown, the Board concludes that the type and degrees of symptomatology contemplated for a 70 percent rating appear to be demonstrated since March 21, 2016. 

However, the Board emphasizes that the symptoms associated with the Veteran's PTSD do not meet the criteria for the maximum 100 percent, rating at any time. A 100 percent rating requires total occupational and social impairment due to certain symptoms. The Board finds that neither the delineated symptoms nor comparable symptoms are shown to be characteristic of the Veteran's PTSD. The evidence of record does not indicate that the Veteran exhibited persistent delusions; grossly inappropriate behavior; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; or memory loss for names of close relatives, own occupation, or own name. She may have some occupational and social impairment, but the record does not show that he has total occupational impairment. In addition, the Veteran had not been found to have any memory loss for names of close relatives, her own occupation, or her own name. Collectively, the Board finds that the psychiatric symptoms shown do not support the assignment of a 100 percent rating since March 21, 2016.

Accordingly, the Board finds that the criteria for a 70 percent rating, but not for a higher rating for PTSD, are met since March 21, 2016. Thus, the Board finds that the preponderance of the evidence is against the assignment of a rating higher than 70 percent. 38 U.S.C. § 5107 (b); Gilbert v. Derwinski, 1Vet. App. 49 (1990).

3. Entitlement to an increased rating for headaches from October 1, 2013 to May 11, 2018

The Veteran’s headache disability was assigned an initial noncompensable rating under Diagnostic Code 8199-8100. The hyphenated diagnostic code indicates that the Veteran’s headaches were rated as analogous to a central nervous system disease (Diagnostic Code 8199) under the criteria for migraines (Diagnostic Code 8100).

Diagnostic Code 8100 provides for a 10 percent rating for characteristic prostrating attacks occurring an average of once every two months over the several months. A 30 percent rating is warranted for characteristic prostrating attacks occurring on an average of once a month over the last several months. A maximum 50 percent rating is warranted for very frequent completely prostrating attacks productive of severe economic inadaptability. 38 C.F.R. § 4.124a Diagnostic Code 8100.

The phrase "characteristic prostrating attacks" means migraine attacks that typically produce powerlessness or a lack of vitality. Johnson v. Wilkie, 30 Vet. App. 245 (2018). In other words, the term "prostrating" takes on its plain meaning of "lacking in vitality or will: powerless to rise: laid low." Id. (citation omitted).

The Veteran expressed that her headaches come and go and that her headaches maker her nauseous. The Veteran indicated that she used to get headaches once a year but now gets headaches at least five times a month. The Veteran expressed that she had to lay down twice because she could not handle the pain. See July 2015 Statement in Support of Claim. 

Private treatment records from Advanced Practice Physical Therapy dated in January 2013 revealed that the Veteran reported a headache. 

Private treatment records from Advanced Practice Physical Therapy dated February 1, 2013 revealed that the Veteran reported a headache. 

Private treatment records from Advanced Practice Physical Therapy dated February 5, 2013 revealed that the Veteran reported having a headache that has taken several days to feel better. 

VA treatment note dated in March 2014 revealed that the Veteran reported experiencing moderate headaches, which was defined as often present with occasional disruption in the Veteran’s activities. Moderate symptoms also included being able to usually continue what a person is doing with some effort. 

In addition, the Veteran expressed that since 2001, she started getting migraines about once or twice a year with throbbing pain, nausea and vomiting, and phonophobia. The Veteran reported that it lasts for a couple hours and that she cannot do much that day. The Veteran also indicated that she gets more minor headaches two to three times a week related to tension in her neck. The Veteran was not interested in medication for her headaches. The examiner noted that physical therapy significantly helped the cervicogenic headaches. 

The Veteran was afforded a VA examination in September 2014. The Veteran was diagnosed with headaches. The Veteran reported that she experiences headaches two to three times a week that last for a couple of hours. The Veteran does not take medication for her headaches. The Veteran has not missed work due to her headaches. The Veteran has not been incapacitated for her headaches in the past year. The examiner noted that the Veteran does not have characteristic prostrating attacks of migraine/non-migraine headache pain. 

As noted above, in order to warrant a compensable 10 percent disability rating for the Veteran’s headache disability, the Veteran’s headache disability must result in characteristic prostrating attacks averaging one in two months over a several months period. 38 C.F.R. § 4.124a, DC 8100. While the Board is mindful of the Veteran’s ongoing complaints of headaches and indeed is sympathetic to her condition, the evidence of record simply does not document that the Veteran’s condition resulted in “characteristic prostrating attacks” for the period on appeal. 

While the Veteran reported weekly headaches at her September 2014 VA examination, she did not indicate that such headaches would be characterized as prostrating. Indeed, the Veteran herself reported at her September 2014 VA examination that she has not missed work due to her headaches and has not been incapacitated for her headaches in the past year. 

In a March 2014 VA treatment note, the Board further notes, that the Veteran reported getting migraines only once or twice a year that result in nausea and vomiting and throbbing pain. She reported only minor headaches two to three times a week. 

The lay and medical evidence reflect that the Veteran did not have characteristic prostrating attacks averaging once every two months. It is paramount that for a compensable rating to be warranted that there be, at a minimum, prostrating headaches once every two months. See Johnson v. Wilkie, 30 Vet. App. 245 (2018)(finding Diagnostic Code 8100 contains successive rating criteria). Consequently, a compensable rating is not warranted.

In reaching this decision, the Board has considered the evidence in the record regarding the Veteran's lay reports of his headaches. The Board acknowledges that the Veteran is competent to testify to the presence of these symptoms, because such requires only personal knowledge as it comes through the senses. See Layno v. Brown, 6 Vet. App. 465, 470 (1994). However, there is no indication that these headaches were prostrating in nature as defined by the Court in Johnson v. Wilkie.

As such, a compensable rating for headaches under Diagnostic Codes 8199-8100 is not warranted for any period of the appeal. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. 38 U.S.C. § 5107(b); 38 C.F.R. § 4.3. 

REASONS FOR REMAND

The following issues are remanded to correct a duty to assist error that occurred prior to the September 2018 rating decision on appeal

1. Entitlement to an increased rating for hypothyroidism from October 1, 2013 to May 11, 2018 is remanded.

Under DC 7903, a 10 percent disability rating is warranted for fatigability, or; continuous medication required for control; a 30 percent disability rating is warranted for fatigability, constipation, and mental sluggishness; a 60 percent disability rating is warranted for muscular weakness, mental disturbance, and weight gain; while a maximum schedular 100 percent disability rating is warranted for cold intolerance, muscular weakness, cardiovascular involvement, mental disturbance (dementia, slowing of thought, depression), bradycardia (less than 60 beats per minute), and sleepiness. Id.

The Veteran was afforded a VA examination in September 2014. The Veteran expressed that her routine blood work in 2002 showed abnormal thyroid studies. The Veteran reported that she started Synthroid in 2002. The Veteran did not report any side effects. The VA examiner identified no residuals associated with the Veteran’s hypothyroidism.

The Veteran expressed that she has no cold tolerance. The Veteran indicated that she freezes easily. The Veteran stated that her nose, ears, fingers, and feet get abnormally cold compared to the people around her. The Veteran stated that parts of her body turns purple at cold temperature. The Veteran expressed that her average heart rate is 49 and that she wears a heart monitor regularly. The Veteran reported that her memory is vague. She indicated that she forgets things easily and must constantly be reminded about appointments. The Veteran reported being constantly tired and sluggish. She stated that she falls asleep at work at her desk. The Veteran stated that she has pulled over while driving to take a nap. The Veteran expressed that when she started her medication in 2002, she gained 60 pounds. She stated that she has a hard time losing weight and that when her medication dosage increases, she gains more weight. The Veteran expressed that she must take medication for her thyroid for the rest of her life which causes her to be depressed and have suicidal thoughts. The Veteran reported that she also has hair loss and her nails are brittle and beak away. See July 2015 Statement in Support of Claim.

The Veteran was afforded a VA examination in April 2016. The Veteran reported depression and hair loss due to her thyroid, as well as weak fingernails, irritable bowel syndrome, cold intolerance, weight gain, and constipation. The VA examiner identified no residuals associated with the Veteran’s hypothyroidism.

The Board finds that the April 2016 VA examiner failed to provide any rationale regarding the Veteran’s claimed symptoms of hair loss, irritable bowel syndrome, cold intolerance, weight gain, and constipation and whether they are due to hypothyroidism alone. Therefore, the Veteran should be afforded a new VA examination that addresses the Veteran’s claimed symptoms and whether they are in fact attributable to her service-connected hypothyroidism disability. 

2. Entitlement to service connection for a left knee disability is remanded.

The Veteran contends that she has a left knee disability related to service. The Veteran’s service treatment records document left knee pain. 

The Veteran was afforded a Gulf War examination in September 2014. The Board finds this examination inadequate. 

Once VA has provided a VA examination, it is required to provide an adequate one, regardless of whether it was legally obligated to provide an examination in the first place. Barr v. Nicholson, 21 Vet. App. 303 (2007).

First, the VA examiner indicated that the Veteran has or has had a knee condition. Thereafter, the examiner expressed that there was not enough objective clinical evidence to make the diagnosis of a bilateral knee condition due to normal x-rays and in-person examination. 

Second, the examiner failed to address the etiology of the Veteran’s April 2014 diagnosis of chondromalacia of the bilateral knees. The examiner is advised that for purposes of establishing service connection, a “current disability” includes a disability which existed at the time a claim for VA disability compensation is filed or during the pendency of the claim, even if that disability subsequently resolves. McClain v. Nicholson, 21 Vet. App. 319, 321 (2007).

Therefore, a new knee VA examination is warranted to address the etiology of the Veteran’s left knee disability. 

3. Entitlement to service connection for a right knee disability is remanded.

The Veteran contends that she has a right knee disability related to service. The Veteran’s service treatment records document right knee pain. 

The Veteran was afforded a Gulf War examination in September 2014. The Board finds this examination inadequate. 

Once VA has provided a VA examination, it is required to provide an adequate one, regardless of whether it was legally obligated to provide an examination in the first place. Barr v. Nicholson, 21 Vet. App. 303 (2007).

First, the VA examiner indicated that the Veteran has or has had a knee condition. Thereafter, the examiner expressed that there was not enough objective clinical evidence to make the diagnosis of a bilateral knee condition due to normal x-rays and in-person examination. 

Second, the examiner failed to address the etiology of the Veteran’s April 2014 diagnosis of chondromalacia of the bilateral knees. The examiner is advised that for purposes of establishing service connection, a “current disability” includes a disability which existed at the time a claim for VA disability compensation is filed or during the pendency of the claim, even if that disability subsequently resolves. McClain v. Nicholson, 21 Vet. App. 319, 321 (2007). 

Therefore, a new knee VA examination is warranted to address the etiology of the Veteran’s right knee disability. 

4. Entitlement to service connection for a sleep disorder is remanded.

The Veteran contends that service connection for a sleep disorder is warranted. 

The Veteran was afforded a VA examination in October 2015. The Veteran was diagnosed with Circadian Rhythm Sleep-Wake Disorder Shift Work Type.

The examiner expressed that the Veteran’s service treatment records noted moderate sleep difficulties. In addition, an August 2010 medical record reported a hypersomnia diagnosis. The notes indicated that the Veteran went to bed at 10 PM with up to an hour latency before sleeping and waking at 5 AM. The notes also indicated that the Veteran’s symptoms would not be consistent with a diagnosis of idiopathic hypersomnia but suggested a combination of psychophysiological insomnia and sleep deprivation. 

The examiner expressed that the Veteran does not currently meet the DSM 5 diagnostic criteria of hypersomnolence disorder due to insufficient length of sleeping episodes. The examiner expressed that hypersomnolence disorder is characterized by excessive sleepiness despite a main sleep period of at least seven hours. The examiner noted that the Veteran reported getting less than four hours due to difficulty initiating and maintaining sleep. 

The examiner reported that the Veteran meets the DSM 5 diagnostic criteria for Circadian Rhythm Sleep-Wake Disorder Shift Work Type. The examiner stated that the Veteran’s service treatment records note some sleep difficulties and the Veteran getting six hours of sleep at a time with no impairment at work, but with some somnolence during the day. The examiner reported that currently the Veteran works a fractured schedule with nights and days rotating every few weeks. The Veteran’s sleeping schedule is noted to have been significantly altered due to the fracture schedule resulting in a deterioration of sleeping patterns from those noted in the Veteran’s service treatment records. The examiner opined that the Veteran’s Circadian Rhythm Sleep-Wake Disorder Shift Work Type is less likely than not caused by or associated with military service.

The Board finds the October 2015 VA examination to be inadequate. The VA examiner determined that there was no current diagnosis of hypersomnolence disorder. However, there are VA medical records noting insomnia in which the examiner did not address during this examination. 

Therefore, a new VA examination is warranted in order to address the etiology of any current sleep disorder to include insomnia. 

The matters are REMANDED for the following action:

1. Schedule the Veteran for an examination by an appropriate clinician to determine the severity of her service-connected hypothyroidism from October 1, 2013, to May 11, 2018. The examiner should provide a full description of the disability and report all signs and symptoms necessary for evaluating the Veteran’s disability under the rating criteria. To the extent possible, the examiner should identify any symptoms and functional impairments due to hypothyroidism alone and discuss the effect of it on any occupational functioning and activities of daily living. The examiner must identify the nature and severity of all manifestations attributable to the Veteran’s hypothyroidism during this time period. 

Specifically, the examiner should comment on whether examination and review of the evidence showed that the Veteran presented objective evidence of cold intolerance; muscular weakness; cardiovascular involvement; mental disturbance (to include signs of dementia, slowing of thought, depression); bradycardia; sleepiness; weight gain; fatigability; constipation; or mental sluggishness as a result of hypothyroidism. 

The examiner must address the Veteran’s prior complaints of depression, hair loss, weak fingernails, irritable bowel syndrome, cold intolerance, weight gain, and constipation that she attributes to her hypothyroidism.

2. Schedule the Veteran for a VA examination with an appropriate examiner to determine the nature and etiology of the Veteran’s bilateral knee disability. The claims folder and a copy of this remand must be provided to the examiner prior to the examination. 

Following a review of the claims file, the examiner is asked to address the following:

The examiner should determine the diagnoses of any currently manifested bilateral knee disability. The diagnosis(es) must be based on examination findings, and all available medical records. 

The examiner is advised that the requirement of a “current disability” is satisfied if a disability is diagnosed at any time during the pendency of the appeal; even though the disability may resolve prior to adjudication of the claim.

For the Veteran’s current bilateral knee disability, to include the April 2014 diagnosis of chondromalacia of the bilateral knees, opine as to whether it is at least as likely as not (50 percent or greater probability) that the Veteran’s bilateral knee disability was causally or etiologically related to her military service.

In providing the above, the examiner is requested to review all pertinent records associated with the claims file. The examiner should also note that the Veteran is competent to attest to matters of which she has first-hand knowledge, including observable symptomatology. If there is a medical basis to support or doubt the history provided by the Veteran, the examiner should provide a fully reasoned explanation.

3. Schedule the Veteran for a VA examination with an appropriate examiner to determine the nature and etiology of the Veteran’s sleep disability. The claims folder and a copy of this remand must be provided to the examiner prior to the examination. 

Following a review of the claims file, the examiner is asked to address the following:

The examiner should determine the diagnoses of any currently manifested sleep disorder. The diagnosis(es) must be based on examination findings, and all available medical records. 

The examiner is advised that the requirement of a “current disability” is satisfied if a disability is diagnosed at any time during the pendency of the appeal; even though the disability may resolve prior to adjudication of the claim.

(Continued on the next page)

 

For the Veteran’s current sleep disorder, to include insomnia, please opine as to whether it is at least as likely as not (50 percent or greater probability) that the Veteran’s sleep disorder was causally or etiologically related to her military service.

In providing the above, the examiner is requested to review all pertinent records associated with the claims file. The examiner should also note that the Veteran is competent to attest to matters of which she has first-hand knowledge, including observable symptomatology. If there is a medical basis to support or doubt the history provided by the Veteran, the examiner should provide a fully reasoned explanation.

 

LESLEY A. REIN

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD M.D.